SUCESIÓN DE MARTÍN RODRÍGUEZ QUIÑONES, ETC., demandan-
tes y recurrentes, *v.* SUCESIÓN DE RAMÓN MORÁN, ETC.,
demandada y recurrida.

*Número:* 12635. *Resuelto:* 3 de mayo de 1962.

*Benjamín Ortiz,* abogado de los demandantes y recurrentes; *Ce-
lestino Iriarte, F. Fernández Cuyar* y *H. González Blanes,*
abogados de la recurrida.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Santana Becerra y Rigau.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

Allá para el año 1929 doña Facunda Córdova Quiñones inició ante la antigua Corte de Distrito de San Juan un expediente de necesidad y utilidad solicitando autorización para la venta en pública subasta de seis fincas rústicas pertenecientes en común proindiviso a ella y sus nueve hijos menores de edad y bajo su patria potestad. Tal autorización se solicitó a base de que existían deudas vencidas ascendentes a más de $24,000, de cuyo pago se había requerido a la peticionaria sin que ésta pudiera saldarlos por falta de recursos económicos para ello. Algunas de las fincas estaban afectas a hipotecas y sobre otras pesaban anotaciones de embargo. Debido a la depresión económica porque atravesaba Puerto Rico para aquella época, le era imposible a la peticionaria obtener crédito para el cultivo de dichas fincas. Los acreedores convinieron en hacer una rebaja sustancial de sus acreencias si las fincas eran vendidas para enjugar las deudas. Ya, por lo menos, uno de los acreedores había demandado judicialmente a la viuda y sus hijos en cobro de dinero y había la inminente probabilidad de que se les llevara a la quiebra involuntaria.

La petición sobre autorización judicial fue jurada por la peticionaria y por sus cuatro hijos mayores de 14 años de edad y se notificó de ella al fiscal. La vista se celebró ante el extinto magistrado don Domingo Sepúlveda y se dio traslado del expediente con el récord taquigráfico al fiscal quien rindió informe por escrito manifestando no tener objeción a lo solicitado. Habiendo el magistrado señor Sepúlveda comenzado a disfrutar vacaciones sin resolver el caso, la peticionaria mediante moción sometió su petición a la con-

sideración y resolución de otro juez de la misma corte, señor Pablo Berga, "toda vez que la prueba documental y testifical aparece unida a los autos y por ella puede considerar los detalles del caso". Dicho magistrado dictó resolución en 19 de julio de 1929, decretando la venta de dichos inmuebles por el precio mínimo de $75 la cuerda, librándose mandamiento al márshal de la corte para el cumplimiento de dicha resolución.

El márshal anunció la subasta para el 13 de agosto de 1929 mediante edictos publicados en el periódico "La Democracia". Declarada desierta por no haber comparecido postor alguno en dicho día, el márshal procedió, a petición del abogado de la peticionaria, a señalarla por segunda vez para el 9 de septiembre de 1929. En esta fecha tampoco hubo postores, por lo que fue nuevamente declarada desierta y se devolvió el mandamiento a la Secretaría de la Corte.

Los hechos que siguieron los relatan correctamente los recurridos en la siguiente forma:

"El día 2 de diciembre de 1929, se radicó una moción por la peticionaria, que fue jurada por su abogado Lcdo. Luis Muñoz Morales alegando para ello que aquella estaba ausente del distrito, y solicitando una nueva subasta por haberse declarado desierta la anterior y que se fijara un precio mínimo de $15,000 por toda la finca. (Esta cantidad representaba un precio aproximado de $50 por cuerda.) Se alegó que había un compromiso del señor Ramón Morán, hecho en reunión de los acreedores, celebrada el 2 de noviembre de 1929, en la cual estuvo presente la viuda doña Facunda Córdova, asistida de su abogado don Luis Muñoz Morales, por el cual el señor Ramón Morán compraría todas las fincas y las acciones del Banco Federal por el precio de $15,400, con cuya cantidad y, además, con la suma de $5,382.82 que estaba en poder del señor Prudencio González, producto de la liquidación de un tabaco perteneciente al causante, se pagarían todas las deudas y le quedaría a la Sucesión un sobrante de $615.92 que sería aumentado a $1,000 por los acreedores para entregarlos a la viuda como represen-

tante de la Sucesión, a cambio del derecho de hogar seguro que ella renunciaba.

"La vista de dicha moción se celebró en los días 9 y 13 de diciembre de 1929. En la continuación de la vista, celebrada el día 13 de diciembre de 1929, compareció y declaró doña Facunda Córdova y también declararon sus hijos Alejandro, de 19 años, Eulogia, de 20 años, Asunción, de 18 años y Benedicta, de 15 años. El expediente con el récord taquigráfico pasó al Fiscal don Domingo Massari quien dictaminó, con fecha 20 de diciembre de 1929, que no hacía objeción a que se rebajara el precio de la subasta en la forma y por el precio que se proponía o el que la Corte juzgare adecuado.

"La Corte, con fecha 20 de diciembre de 1929, concedió autorización para la venta en pública subasta de las seis fincas por el precio mínimo de $15,000 (quince mil dólares) en conjunto y $400 por las acciones del Banco Federal. Librado mandamiento al márshal éste señaló el día 12 de enero de 1930 para la subasta de las fincas y las acciones del Banco Federal y en dicho día adjudicó, al Sr. Ramón Morán, las seis fincas por $15,000 y las acciones del Banco Federal por $400. De la suma de $15,400, producto de la subasta, el comprador retuvo $11,608.15 para satisfacer las hipotecas, con sus intereses adeudados, del Banco Federal, Schluter & Co., y Pilar Zayas, las contribuciones debidas al Tesoro Insular hasta diciembre 30 de 1929 y sus créditos. Todos estos créditos aparecen reconocidos en la resolución del tribunal de 20 de diciembre de 1929, con excepción de la hipoteca del Banco Federal que figuraba, con sus intereses, montante a $6,930.62 y que, a la fecha de la subasta, ascendía a $7,137.15, consistiendo la diferencia en los intereses devengados por dicha hipoteca desde la fecha en que fueran liquidados en la reunión de acreedores hasta el día de la subasta, lo que así aclaró el márshal en el acta de la subasta.

"La escritura de venta judicial le fue otorgada al adjudicatario Ramón Morán diez años después, en 3 de mayo de 1940 ante el notario José E. Díaz, bajo el número 36 de su protocolo." (Alegato Recurridos, págs. 2 a 4.)

En el año 1948 la Sucesión de doña Facunda Córdova y de su esposo don Martín Rodríguez Quiñones, interpusieron acción contra la sucesión de don Ramón Morán para

reivindicar las seis fincas objeto del expediente de necesidad y utilidad a que ya nos hemos referido, alegando diversos motivos de nulidad de dicho expediente.

Contestada la demanda enmendada y después de innumerables incidentes que es innecesario relatar, el Tribunal Superior finalmente dictó sentencia en 21 de marzo de 1958, declarando sin lugar la demanda.

Contra dicha sentencia se interpuso el presente recurso señalándose la comisión del siguiente error:

"Cometió error la Sala de San Juan del Tribunal Superior al resolver que fue válido y eficaz el procedimiento de Autorización Judicial de venta de bienes de menores, considerando que hubo las siguientes irregularidades:

"(a) El Fiscal no compareció personalmente en la vista del caso de Autorización Judicial.

"(b) No hubo prueba pericial adecuada sobre el valor de los bienes.

"(c) Aun suponiendo que el Sr. Morán, quien declaró sobre el precio mínimo que podía ser obtenido por los bienes, hubiese sido un perito, él fue el comprador en la subasta, estando él incapacitado para ser el adjudicatario.

"(d) El Juez que aprobó la Autorización no intervino en la vista del caso.

"(e) El Márshal aumentó por su cuenta el importe de un crédito a ser deducido del precio de venta.

"(f) Los menores no intervinieron en una reunión privada que llegó a un acuerdo en cuanto al precio de venta de los bienes, siendo ese acuerdo determinante en la decisión judicial aprobatoria de la venta.

"(g) No se probaron debidamente los créditos."

Consideramos que la falta de asistencia del fiscal a la vista de la solicitud sobre autorización judicial, no justifica en este caso por sí solo que se anule dicho expediente, especialmente en ausencia de fraude o de que se perjudicaron los intereses de los menores. Los recurrentes reconocen que este planteamiento ha sido resuelto en su contra en el caso de *Lókpez* v. *Fernández*, 61 D.P.R. 522. Dijimos en dicho caso: "La excusa de que en la corte inferior ha prevalecido

la práctica de que el fiscal nunca asista a la vista de esos casos limitándose a informar por escrito de acuerdo con la transcripción de evidencia, podría prevalecer por excepción y en defensa y protección de las resoluciones recaídas en aquellos casos en que el expediente demostrase que se practicó prueba para sostener los hechos alegados en la petición constitutivos de la necesidad y utilidad de la autorización solicitada. Aunque merecería y obtendría nuestra censura, siendo un error aislado, dicha omisión no sería suficiente para que pudiera prosperar una acción de nulidad. Decimos esto en contestación al temor expresado por la corte inferior de que si la presente acción prosperara podrían anularse miles de casos en los que los fiscales de dicha corte, siguiendo la costumbre y práctica establecidas no han comparecido a las vistas. De hecho puede demostrarse que la intervención del fiscal fue eficaz aunque no asistiera a la vista. . . . . . Y aun cuando en otros casos el fiscal no haya asistido a la vista y se haya limitado a rendir un informe no oponiéndose a la autorización por estar justificada por la prueba, existiendo dicha prueba en la transcripción, tampoco sería motivo suficiente de nulidad." (Págs. 557–558.) ■

Nos piden sin embargo, que revoquemos dicho pronunciamiento. Si consideramos que el expediente en este caso se tramitó en el año 1929, o sea, cerca de catorce años antes de resolverse el caso de *Lókpez*, y que en aquella época prevalecía la práctica de que los fiscales no comparecían a las vistas en los procedimientos sobre autorización judicial para la venta de bienes de menores, nos parece justa y razonable la excepción establecida a favor de aquellos casos en que el expediente demostrase que se practicó prueba para sostener los hechos alegados en la petición constitutivos de la necesidad y utilidad de la autorización solicitada. En el caso de autos hubo esa prueba y nada hay en el expediente indicativo de que la no intervención del fiscal en la vista causó lesión a los intereses de los menores. Véase *Costa* v. *Piazza*, 51 D.P.R. 689. ■

Se alega como vicio de nulidad que no hubo prueba de la tasación de los bienes a los efectos contributivos y que tampoco hubo prueba pericial respecto al valor de dichos bienes. Sin embargo en la primera vista se presentaron como prueba los requerimientos que le hiciera a doña Facunda Córdova vda. de Rodríguez, madre de los recurrentes, el Tesorero de Puerto Rico exigiéndole el pago de las contribuciones adeudadas por las fincas. Además declararon dos testigos sobre el valor en el mercado de dichos bienes, tasándolos en $75 la cuerda de terreno. En la segunda vista declararon otros dos testigos sobre el valor de dichos bienes. También se presentó en evidencia el acuerdo de los acreedores tomado en una reunión privada con la viuda doña Facunda Córdova y uno de sus hijos, mayor de 14 años de edad. Esa reunión se celebró después de haber quedado desiertas las dos subastas anunciadas por falta de postores. El precio se redujo a $15,000 en total después que los acreedores rebajaron sus créditos a un cincuenta por ciento y a un treinta por ciento adicional a fin de que le sobrara algo a la viuda y a sus hijos. En la segunda vista declararon la viuda y sus cuatro hijos mayores de edad. Después que el fiscal rindió informe no objetando a que se rebajara el precio mínimo para la subasta, el tribunal señaló el precio por el cual fueron vendidas las fincas. Se cumplió sustancialmente con la ley.

Otro alegado motivo de nulidad consiste en que el señor Morán, adjudicatario en la subasta declaró como perito, estando incapacitado para adquirir por compra los bienes subastados conforme lo dispone el inciso 4 del Artículo 1348 del Código Civil [31 L.P.R.A., sec. 3773].(¹)

---

(¹) El Artículo 1348 del Código Civil dispone:

"Sección 3773. Personas que no pueden adquirir por compra

"No podrán adquirir por compra, aunque sea en subasta pública o judicial, por sí ni por persona alguna intermedia:

"1. .         .         .         .         .         .         .         .

"2. .         .         .         .         .         .         .         .

"3. .         .         .         .         .         .         .         .

Independientemente de si la prohibición de comprar que rige para los jueces y los peritos, se aplica únicamente a los bienes del Estado, según sostienen los recurridos, estamos convencidos de que el señor Morán no declaró como perito, por lo que no tenemos que llegar a resolver esa cuestión. Morán identificó el acuerdo de los acreedores de rebajar sustancialmente sus créditos contra la Sucesión en una suma de $10,200 y su proposición de pagar $15,000 por las fincas y $400 por las acciones del Banco Federal en el entendido de que si en la subasta algún postor ofrecía más de esa cantidad, la misma quedaría en beneficio de la sucesión. Expresó su criterio de que de no venderse las fincas en subasta, los bienes de la sucesión serían insuficientes para cubrir las deudas habiendo el peligro de que así sucediera ya que uno de los acreedores había demandado judicialmente a la sucesión en cobro de su crédito. A preguntas del juez declaró que creía que nadie ofrecería $15,000 por las fincas aunque ello era posible; que cree que las fincas perdieron algo después del ciclón pero que él no las ha visto después del ciclón. De suerte que para la fecha de la vista Morán desconocía el estado de las fincas y siendo así, difícilmente podía considerársele como un perito en materia de justiprecio de las referidas propiedades.

El supuesto vicio de que el juez que aprobó la autorización judicial no intervino en la vista del caso, carece de mérito. Es cierto que la primera vista se celebró ante el magistrado Sr. Domingo Sepúlveda y que por haber éste tomado vacaciones, la peticionaria solicitó de otro juez, el Sr. Berga, que con vista del expediente, la transcripción de evidencia y el informe del fiscal, dictara la resolución correspondiente y que dicho otro magistrado así lo hizo. Sin

---

"4. Los empleados públicos, los bienes del Estado Libre Asociado de Puerto Rico, de los municipios, de los pueblos y de los establecimientos también públicos, de cuya administración estuviesen encargados.

"Esta disposición regirá para los jueces y peritos que de cualquier modo intervinieren en la venta.

"5. . . . . . (31 L.P.R.A., sec. 3773.)

embargo, por haber quedado desiertas las dos subastas seña-
ladas, se celebró otra vista ante el juez Berga, practicándose
prueba sobre la necesidad y utilidad de la autorización soli-
citada.   Dicho magistrado dictó la resolución final en cuyo
cumplimiento se subastaron las propiedades y lo hizo a base
de la prueba practicada en ambas vistas.   El alegado motivo
de nulidad es por lo tanto, insostenible.

El márshal no aumentó por su cuenta, según sugieren
los recurrentes, el importe de un crédito a ser deducido del
precio de venta.   Al 2 de noviembre de 1929, fecha en que
fue firmado el convenio de los acreedores, el crédito hipo-
tecario del Banco Federal ascendía con sus intereses a la
suma de $6,930.62.   Sin embargo, a la fecha de la venta
judicial dicho crédito con sus intereses ascendía a $7,137.15,
esto es, dicho crédito había devengado en el ínterin intereses
montantes a $206.53.   En la resolución del tribunal auto-
rizando la venta de los bienes de los menores, figuran entre
otros, y como un crédito completo que no había sido reba-
jado, el hipotecario a favor del Banco Federal, liquidado
desde luego, a la fecha de la vista del caso.   En uno de
los Por Cuantos de dicha resolución se consignó que se había
solicitado que el licitador que obtuviera la buena pro y a
quien se le adjudicasen las fincas se haría cargo de pagar
por su cuenta las hipotecas que pesaban sobre las mismas,
reteniendo su importe, y que según la relación de dichos cré-
ditos incluía el del Banco Federal de $6,930.62.   En la parte
dispositiva de la susodicha resolución se autorizó al licitador
que obtuviera la buena pro "retener en su poder el importe
de los créditos hipotecarios relacionados de cuyo pago se
hará cargo, . . ." El comprador retuvo en su poder el ca-
pital del crédito hipotecario del Banco Federal y sus inte-
reses hasta la fecha de la venta.   No se nos llama la aten-
ción de que el comprador retuviera alguna suma en exceso
de dicho crédito y sus intereses o de que la liquidación de

316

los intereses sea errónea. Por tanto, la alegada irregularidad, de existir, no produciría la nulidad del procedimiento.

Tampoco tiene importancia el hecho de que los menores, con excepción de uno de ellos, no participara en la reunión de los acreedores con la madre de dichos menores. En realidad, ningún acuerdo allí tomado obligaba los bienes inmuebles de los menores. Era la corte, la que en definitiva resolvería sobre la necesidad y utilidad de la venta de sus bienes.

Por último diremos que también carece de mérito la alegación de que no se probaron los créditos. En el expediente de necesidad y utilidad hay prueba suficiente tanto documental como testifical de todos y cada uno de los créditos relacionados en la petición. Por otro lado la resolución de la corte ordenando la venta de los bienes de los menores autorizaba al comprador a retener únicamente el importe de los créditos hipotecarios que fueron debidamente evidenciados con certificaciones del Registro de la Propiedad y la diferencia debía consignarse en Corte, sujeta a sus órdenes posteriores.

*No habiéndose cometido el error señalado se confirmará la sentencia del Tribunal Superior.*

